UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| BRIGID HEUSER,<br><br>　　Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>　　Defendant. | Case No. 2:20-cv-00028<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:　The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

Plaintiff Brigid Heuser filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 4.) Now before the Court is Heuser's motion for judgment on the administrative record (Doc. No. 17), to which the Commissioner has responded in opposition (Doc. No. 19). Having considered the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that Heuser's motion be granted.

### I.　Background

#### A.　Heuser's DIB and SSI Applications

Heuser filed applications for DIB and SSI on January 9, 2017, alleging that she has been disabled since June 29, 2016, as a result of type I diabetes, right shoulder impingement syndrome,

the effects of trigger finger release surgery performed on her right ring finger, and neck problems. (AR 70, 83.[1]). The Commissioner denied Heuser's applications initially and on reconsideration. (AR 95, 96, 129, 130.) At Heuser's request, an administrative law judge (ALJ) held a hearing on October 25, 2018. (AR 36–68, 147–49, 150–52.) Heuser appeared with counsel and testified. (AR 38, 44–60.) The ALJ also heard testimony from Anne Thomas, a vocational expert, and Ellouise Hensley, Heuser's mother. (AR 60–67.)

### B. The ALJ's Findings

On February 13, 2019, the ALJ issued a written decision finding that Heuser was not disabled within the meaning of the Social Security Act and applicable regulations and denying her claims for DIB and SSI. (AR 19–30.) The ALJ made the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.

2. The claimant has not engaged in substantial gainful activity since June 29, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

\* \* \*

3. The claimant has the following severe impairments: diabetes mellitus, dysfunction of major joints, osteoarthrosis and allied disorders, carpal tunnel syndrome, depression, anxiety and obsessive-compulsive disorder (OCD) (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\* \* \*

---

[1] The Transcript of the Administrative Record (Doc. No. 13) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can lift and/or carry 20 pounds occasionally, 10 pounds frequently. She can stand and/or walk, with normal breaks, for a total of 6 hours per 8-hour workday, and can sit, with normal breaks, for a total of 6 hours per 8-hour workday. She can never [c]limb ladders, ropes, and scaffolds. She can frequently climb ramps/stairs. She is unlimited in all other postural activities. In terms of manipulative limitations, she can frequently reach overhead with the left upper extremity and occasionally reach overhead with the right DOMINANT upper extremity. She can frequently perform fine and gross manipulations (i.e. handling, and fingering) with bilateral upper extremities. In terms of environmental limitations, she should avoid concentrated exposure to extreme cold, vibration, extreme heat, and humidity, and respiratory irritants, and she must never operate a motor or motorized vehicle in the work setting. In terms of mental limitations, she is restricted to the performance of simple, routine and repetitive tasks. She is limited to low-stress work, which I define as requiring few decisions or judgments to be made, and few changes in a routine work setting. Lastly, she can only occasionally interact with the general public, but can frequently interact with co-workers, and with supervisors.

\* \* \*

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 11, 1965, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

\* \* \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 21–29.) The Social Security Appeals Council denied Heuser's request for review on April 28, 2020, making the ALJ's decision the final decision of the Commissioner. (AR 1–6.)

### C. Appeal Under 42 U.S.C. § 405(g)

Heuser filed this action for review of the ALJ's decision on May 15, 2020 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. § 405(g). Heuser argues that the ALJ erred in failing to consider or discuss Hensley's testimony. (Doc. No. 18.) The Commissioner argues that the ALJ's decision is supported by substantial evidence and complies with SSA regulations. (Doc. No. 19.) Heuser did not file an optional reply.

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and

has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

### B. Determining Disability at the Administrative Level

DIB and SSI benefits are available to individuals who are disabled, which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing disability determination for DIB and SSI benefits are identical. *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and

defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can

perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

**III.     Analysis**

At the administrative hearing, Heuser testified that her diabetes has affected her ability to work because she "black[s] out" three or four times a month when she engages in activity. (AR 52.) She stated that, about five or six times a month, she experiences high blood sugar that causes her to "get very dizzy" and feel like her "mind gets out of control" and she "do[es]n't know what [she's] doing." (AR 53.) She also testified that, during one such episode, she blacked out while driving and wrecked her truck, but doesn't remember the accident. (AR 54.)

Heuser called her mother, Hensley, as a witness at the administrative hearing. (AR 63.) Hensley testified that Heuser "has her good days" and "bad days," but that she has noticed Heuser "acting strangely or not being able to function like she would normally be able to function" "at least twice a week . . . ." (AR 65.) She stated that she has entered Heuser's home to find Heuser in a coma-like state and that Heuser frequently experiences symptoms of low blood sugar when she engages in activities. (AR 65–66.) She also described vocational support provided by Heuser's past employers, who, after finding Heuser lying on the floor at work, began to "watch her" actions, "g[o]t to know how she would act" when she experienced blood sugar issues, encouraged her to take breaks and eat snacks, and let her leave work early. (AR 66.)

The ALJ began his analysis of Heuser's testimony by articulating the relevant standard for assessing the claimant's symptoms:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

7

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(AR 24–25.) The ALJ then analyzed Heuser's reported symptoms as follows:

The claimant alleged she is unable to work due to type I diabetes, impingement syndrome of the right shoulder, trigger finger release on right ring finger, and neck (Exhibit 4E, p. 2). At the hearing, the claimant described her work history and stated she stopped working in 2016 and received unemployment benefits. She said she did not recall working in 2017. She stated that she could drive but her right arm and hand is painful and goes numb. She acknowledged that she did not have physical therapy due to cost. She said she could not do a great deal of cleaning with her right hand because it hurts in the neck and shoulder blade so she has to rest often. The claimant testified that her blood sugars go from high to low throughout the day and she becomes dizzy and does not know what she is doing. Additionally, the claimant said she has anxiety and depression and she has to have things a certain way or she panics. She said she has difficulty being around a group of five people. She said she has good days and bad days. The claimant said she goes to yard sales once a week but does not participate in social activities.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are generally not supported by the objective medical evidence. The undersigned finds that the claimant is limited to light exertion with limits to climbing, reaching, handling and fingering due to dysfunction of major joints along with osteoarthrosis and allied disorders and carpal tunnel syndrome (Exhibits 2F, 4F, 7F, 15F). For example, magnetic resonance imaging (MRI) in July 2016 showed mild degenerative changes, mild right neural foraminal narrowing, and mild stenosis at C5-C6 (Exhibits 7F, pp. 21, 22; 9F, p. 7). The claimant underwent epidural steroid injection (Exhibit[ ] 3F, p. 3). In April 2017, images of the cervical spine showed mild to moderate findings including mild foraminal encroachment (Exhibits 13F, p. 1 and 20F, p. 7). She complained of back pain, joint stiffness, and joint swelling (Exhibit 22F). In May 2017, Dr. Saunders advised surgery as a last resort (Exhibit 15F, p. 4). A cervical spine CT myleogram

in June 2017 showed mild to moderate cervical spondylosis, degenerative changes, moderate disc bulge osteophyte with mild flattening, which appeared to contact the right C6 nerve root (Exhibit 20F, p. 9). In September 2017, Joseph Jestus, M.D., performed anterior cervical discectomy and fusion (ACDF) on CS/6 (Exhibit 20F, p. 18). In December 2017, there was decreased range of motion on the cervical spine and right shoulder (Exhibit 19F, p. 1).

Right shoulder MRI of November 2016 showed type II acromial spur, negative downslope and impingement syndrome of the right shoulder was treated by Ralph Saunders, M.D. Examination revealed tendinitis and bursitis but no rotator cuff tear. She had some weakness on the right against triceps rated as 4/5 (Exhibit 7F, p. 8). Physical therapy was advised but the claimant said she could not afford the treatment (Exhibits 8F and 9F, p. 8). In May 2017, Dr. Saunders reported that on examination, the claimant could elevate her right arm overhead, touch her shoulder, opposite shoulder, top of head, and reach behind her back (Exhibit 15F, p. 4).

In December 2017, the claimant reported her symptoms had improved except the persistent shoulder pain and painful range of motion on the right shoulder. She had reduced the amount of pain medication. Motor examination revealed normal strength in the upper and lower extremities bilaterally. Dr. Jestus reported he offered more physical therapy, as he did not have any other thoughts as to treatment (Exhibit 20F, pp. 29, 30). In December 2017, the claimant had pain in both hands radiating to the wrists, worse on the right. Sivalingam Kanagasegar, M.D., assessed cervical disc degeneration, unspecified cervical region, abnormal immunological finding with positive antinuclear antibody (ANA), and primary osteoarthritis in the right hand and left hand. On examination, she had decreased motion and tenderness on the right upper extremity but no tender points for fibromyalgia (Exhibit 19F, pp. 2, 4). In May 2017, Dr. Saunders noted the claimant worked part time and could stand for extended periods of time, sit, kneel, climb a step through the ladder, and perform repetitive shoulder motion lifting at 20 pounds or less. He said she could perform repetitive motions pressing down with the hands and wrists. He said he believed the claimant was a candidate for social security disability, as her condition "may" worsen over time (Exhibit 15F, p. 3). Some weight is assigned this treating physician's medical findings. However, the longitudinal evidence supports greater limitation. No weight is assigned to the medical examiner's opinion that the claimant was a candidate for social security disability.

Carpal tunnel syndrome was demonstrated on examination showing positive Spurling's and Phalen's on the right hand. Motor was 4/5 on right pronator and right biceps (Exhibit 20F, p. 13). Dr. Saunders reported that the nerve conduction study was positive for carpal tunnel, which could contribute to numbness and tingling (Exhibits 15F, p. 4 and 17F, p. 15). In review of the objective medical evidence the combination of these impairments provides for no more than a light residual functional capacity, which is an exertional capacity that resolves the issue in this case given the claimant's vocational factors discussed below.

9

The additional evidence of medically determinable impairments causing other work-related limitations only further supports the findings in the above residual functional capacity. For instance, diabetes mellitus I is evidenced in the medical record. In November 2016, the claimant underwent epidural steroid injection, which resulted in diabetic ketoacidosis (DKA) and hospitalization (Exhibit 19F, p. 4). However, once admitted, the DKA resolved by the next day with full resolution of acidosis the following day (Exhibit 5F, pp. 3 to 6). The claimant provided a logbook of glucose levels through March 2018 (Exhibit 21F). Nonetheless, with the exception of a few visits noting the DKA, diabetes was described as controlled (Exhibit 22F). Diabetes is mentioned in the claimant's history but for the most part, there is little mention of any other complications from this impairment (Exhibits 7F, 18F, 19F, 20F). In December 2016, Kasturi Rohini, M.D., diagnosed neurological disorder associated with type 1 diabetes mellitus. However, neurological examination was normal (Exhibit 6F, p. 39). Nonetheless, in combination with the other severe and non-severe impairments, the undersigned finds the objective evidence supports the environmental and respiratory limitations, as well as reduced strength capacity consistent with no more than light work.

The limits involving simple, routine tasks, work-setting changes, stress, and interaction are consistent with the evidence in regards to the mental impairments. In regards to depression, in October 2017, the claimant reported she did not believe she had ever been officially diagnosed with depression, yet symptoms such as anhedonia, anxiety, appetite changes, crying spells, and decreased concentration began about two years prior. However, she denied any current depressive symptoms (Exhibit 22F, p. 1). Records from October 2018 include reports that depression is worse than anxiety and she had insomnia (Exhibit 22F).

As for anxiety and OCD, in October 2017, Kimberly Spivey-Schwartz, N.P., indicated that the claimant had suggestive symptoms but did not carry an official diagnosis of anxiety disorder. Yet, history was pertinent for depression and OCD (Exhibit 22F, p. 1). In May 2018, the claimant reported that she was doing much better and felt more calm with only intermittent symptoms (Exhibit 22F, p. 49). In October 2018, the claimant reported that OCD symptoms were somewhat less with medication (Exhibit 22F, p. 40).

On consultative evaluation in March 2017, Stephen Hardison, M.A., noted the ability to remember and carry out simple one and two-step instructions without significant difficulty. The claimant's ability to remember and carry out somewhat more detailed instructions would not appear significantly limited in a structured routine setting. The claimant's ability to sustain concentration and attention for appropriate periods of time in a very structured routine setting would not appear more than mildly limited and she reportedly has been able to concentrate adequately at her part-time job. Her ability to interact appropriately with co-workers, supervisors, and general public would not appear more than mildly limited. Her ability to adjust to changes in a very structured routine setting could be mildly limited. Her ability to take appropriate precautions regarding normal hazards would not appear significantly limited. Her ability to make very simple job-related

10

decisions independently would not appear significantly limited. The claimant's ability to make somewhat more detailed job-related decisions independently in a structured routine setting would not likely be significantly limited. However, based on the medical evidence submitted at the hearing level from her primary care provider, some weight is assigned this opinion. There does seem to be increased anxiety and some OCD that justifies moderate limitations in concentration, persistence, and pace and adaptation and self management (Exhibit 22F).

As to the side effects of medication, there are none established which would interfere with the jobs identified below by the vocational expert (Exhibit 7E, p. 11). As to effectiveness of treatment, although the claimant has received treatment for the allegedly disabling symptoms, the record also reveals that the treatment has been generally successful in controlling those symptoms. In May 2018, the claimant reported intermittent anxiety but she was doing much better, her mood was improved, and anxiety significantly lessened (Exhibit 22F, p. 49).

As to activities of daily living, the claimant has described daily activities, which are not consistent with complaints of disabling symptoms and limitations. In October 2017, the claimant reported she did not like to go out in public and had panic attacks and anxiety (Exhibit 22F, p. 1). She testified that she could not be around more than five people or she would panic. Yet, the claimant reported going to the grocery store and to the park occasionally. She said she visited family and attended her grandkids' school events and activities (Exhibit 7E). Furthermore, in May 2018, she reported she recently attended and enjoyed "Hippie Fest" (Exhibit 22F, p. 49).

The claimant testified that she could not do a lot of cleaning or lifting with her right hand. Yet, she reported she enjoys "cleaning house," baking, yard selling, and playing with her grandson (Exhibit 22F, p. 8).

As for the opinion evidence, at the initial determination, the State Agency medical consultant opined the claimant could perform light work with occasional overhead reaching on the right upper extremity with frequent overhead reaching on the left and that she should avoid concentrated exposure to respiratory irritants (Exhibits 1A and 2A). Great weight is assigned this opinion, as it is supported by objective evidence including imaging and examinations showing difficulties with the right shoulder greater than the left. However, considering the combination of impairments, the undersigned finds greater environmental limits based on evidence received at the hearing level (Exhibits 17F to 22F). The State Agency medical consultant making the redetermination is assigned some weight, as the manipulative and environmental limitations are consistent with the record as a whole. However, the weight restrictions are not compliant with the Regulations although the claimant is able to lift at least twenty pounds occasionally (Exhibits 5A and 6A).

Some weight is assigned the State Agency psychological consultants who concluded the claimant had no more than mild limits in functioning, which is

supported by the medical evidence in the areas of understanding, remembering, and applying information and interaction with others (Exhibits 2A and 6A). However, the longitudinal treatment records from the claimant's primary care provider shows increased anxiety and some OCD symptoms that substantiates moderate limitations in concentration, persistence, and pace and adaptation and managing oneself (Exhibit 22F).

In June 2016, Robert Newton, D.C., reported the claimant had a cervical spine disc herniation and underlying degenerative arthritis that limits the range of motion and strength in the neck and the right arm. She had some inherent weakness in the right arm and the pain was more severe when she lifted anything overhead and the weakness more noticeable. He said the damage in the neck affected nerves that control the muscles that allow her to reach and lift overhead. On examination, she had no problem lifting from the ground to the waist. He requested the claimant to be allowed to perform a job that does not require heavy lifting and reaching overhead on a constant basis. He concluded that she possibly needed a surgical procedure to address the problem, but could not afford it (Exhibits 1F and 4F, p. 5). Although Dr. Newton is not an acceptable medical source, the evidence shows consistency with the longitudinal medical history regarding overhead lifting and some limitations regarding her arm.

In sum, the above residual functional capacity assessment is supported by the objective medical evidence, the weight of the medical opinion evidence, the claimant's daily activities and the claimant's work history. Although the claimant testified and she may honestly believe that she is unable to perform work, the undersigned has weighed all of the evidence of record and thus, finds that the residual functional capacity found herein is justified.

(AR 25–28.) The ALJ did not mention Hensley's testimony in the written decision.

Heuser argues that the ALJ was required to consider Hensley's non-medical opinion testimony under Social Security Ruling 06-03p[2] and erred by failing to explicitly discuss that testimony in the written decision. (Doc. No. 18.) Heuser asserts that Hensley's testimony is

---

[2] The Social Security Administration rescinded SSR 06-03p on March 27, 2017. *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 FR 152623-01, 2017 WL 1105348 (Mar. 27, 2017). However, this Court and several others in the Sixth Circuit have found "that the rescission of the SSR applies only to disability claims filed after March 27, 2017[.]" *Kemp v. Saul*, No. 3:19-cv-00431, 2020 WL 6305566, at *2 n.3 (M.D. Tenn. Oct. 28, 2020) (citing *Dougherty v. Saul*, No. 2:18-CV-189, 2020 WL 1151275, at *3 (E.D. Tenn. Mar. 9, 2020)); *see also Ashmore v. Berryhill*, No. 1:17-cv-00100, 2019 WL 1198889, at *3 (M.D. Tenn. Mar. 14, 2019). Heuser filed her claims on January 9, 2017, so SSR 06-03p applies to these claims.

supported by objective medical evidence, including Heuser's blood sugar logs and other treatment records from the Diabetes Center at Cookeville Regional Medical Group. (*Id.*)

SSR 06-03p discusses "other sources" whose opinions the ALJ may consider, including: (1) medical sources that are not qualified as "acceptable medical sources," such as nurse practitioners, physician assistants, or chiropractors; (2) "[n]on-medical sources" who have seen the individual in a professional capacity, such as counselors, teachers, and social welfare agency personnel; and (3) "other 'non-medical sources'" who have not seen the individual in a professional capacity, such as spouses, relatives, friends, and neighbors. SSR 06-03p, 2006 WL 2329939, at *2–3 (Aug. 9, 2006). Hensley's testimony falls into the third subcategory: evidence from non-medical sources who have not seen the individual in a professional capacity.

The ruling provides the following guidance for evaluating evidence from these sources and explaining how they were considered:

> [i]n considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and other factors that tend to support or refute the evidence. . . .
>
> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision . . . .

*Id.* at *6.

While "SSR 06-03p does not require ALJs to give explicit attention in their decisions to every shred of opinion evidence," *Washington v. Soc. Sec. Admin.*, No. 3:13-cv-00785, 2017 WL 975349, at *8 (M.D. Tenn. Mar. 14, 2017), the Sixth Circuit has held that, when "lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness[,]" *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012). However, "even if the ALJ erroneously disregards a lay witness's testimony, the error is harmless if 'no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Id.* (quoting *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1056 (9th Cir. 2006)); *see also Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-14797, 2015 WL 730094, at *37 (E.D. Mich. Feb. 19, 2015) (applying harmless error analysis where ALJ failed to explicitly consider affidavit of claimant's mother).

Considering the record evidence as a whole, the Court finds that a reasonable ALJ who fully credited Hensley's testimony and properly considered it in light of all the record evidence could have reached a different conclusion regarding her disability. *See Maloney*, 480 F. App'x at 810. The ALJ's failure to explicitly consider Hensley's testimony was therefore not harmless error. Further, the Court finds that the ALJ's conclusions about Heuser's diabetes were not supported by substantial evidence.

Hensley testified that Heuser regularly experienced blood sugar fluctuations (AR 65–67), which is consistent with Heuser's testimony about her diabetes symptoms (AR 52–54) and Heuser's blood sugar logs and treatment records from the Diabetes Center at Cookeville Regional Medical Group (AR 931–1005). The ALJ noted that Heuser had provided her blood sugar logs but did not discuss the data they contained. (AR 26.) Instead, the ALJ stated that, "with the exception of a few visits noting the DKA, diabetes was described as controlled." (*Id.*)

Heuser was hospitalized for DKA in November 2016. (AR 460.) But Heuser's providers at the Diabetes Center at Cookeville Regional Medical Group also described her diabetes as uncontrolled on February 27, May 18, and September 12, 2017. (AR 948, 958, 961, 980.) They noted increased blood sugar on May 18, September 12, and November 14, 2017, (AR 943, 949, 952) and stated, on June 27, 2017, that Heuser's blood sugar was "in extremes" (AR 952). The ALJ did not discuss these treatment notes, which are consistent with Heuser's and Hensley's testimony. To support the conclusion that Heuser's "diabetes was described as controlled" (AR 26), the ALJ referred only to treatment records from Nurse Practitioner Kimberly Spivey-Schwartz, whom Heuser saw for psychiatric care (AR 1006–82).

While the "ALJ need not discuss every piece of evidence in the record for his decision to stand[,]" *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004), the ALJ is not permitted to "cherry-pick the record to support [his] conclusions, but [ ] must 'consider the evidence taken as a whole[,]'" *Davis v. Colvin*, No. 2:10-cv-00088, 2015 WL 3504984, at *6 (M.D. Tenn. May 28, 2015) (quoting *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir. 1984)). Here, the record evidence supports a conclusion that Heuser's diabetes was not controlled. The Court therefore finds that, with respect to Heuser's diabetes symptoms, the ALJ's finding that Heuser's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (AR 25) is not supported by substantial evidence.

This case should therefore be remanded to the ALJ to reconsider Heuser's diabetes symptoms in light of the record evidence. On remand, the ALJ must also consider Hensley's testimony or "give reasons for not crediting [Hensley's] testimony that are germane to" her. *Maloney*, 480 F. App'x at 810; *see also Gross v. Colvin*, Civ. Action No. 15-11543, 2016 WL

4648906, at *6 (E.D. Mich. June 8, 2016) (recommending remand based on ALJ's failure to give adequate reasons for discrediting claimant's mother's testimony and requiring that ALJ support any credibility determinations on remand "with sufficiently specific reasoning to allow for meaningful review"), *report and recommendation adopted sub nom. Gross v. Comm'r of Soc. Sec.*, 2016 WL 4608240 (E.D. Mich. Sept. 6, 2016).

### IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Heuser's motion for judgment on the administrative record (Doc. No. 17) be GRANTED, that the ALJ's decision be VACATED, and that this case be REMANDED for further administrative proceedings consistent with this Report and Recommendation.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 11th day of August, 2021.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge